1   ANDRÉ BIROTTE JR.
    United States Attorney
2   CHRISTINE C. EWELL
    Assistant United States Attorney
3   Chief, Criminal Division
    JEREMY D. MATZ (Cal. Bar # 199401)
4   Assistant United States Attorney
    Major Frauds Section
5   MICHAEL R. WILNER (Cal. Bar # 156592)
    Assistant United States Attorney
6   Deputy Chief, Major Frauds Section
         1100 United States Courthouse
7        312 North Spring Street
         Los Angeles, California 90012
8        Telephone:  (213) 894-0649/0687
         Facsimile:  (213) 894-6269
9        E-mail:   jeremy.matz@usdoj.gov
                   michael.wilner@usdoj.gov
10
    Attorneys for Plaintiff
11  UNITED STATES OF AMERICA

12                    UNITED STATES DISTRICT COURT

13             FOR THE CENTRAL DISTRICT OF CALIFORNIA

14  UNITED STATES OF AMERICA,    ) No. CR 07-755-DDP
                                 )
15            Plaintiff,         ) **GOVERNMENT'S SENTENCING MEMORANDUM**
                                 ) **AND MOTION FOR DOWNWARD DEPARTURE**
16            v.                 ) **PURSUANT TO USSG § 5K1.1 FOR**
                                 ) **DEFENDANT SCOTT ROBINSON; EXHIBITS**
17  L. SCOTT ROBINSON,           )
                                 ) Hearing:  April 22, 2010,
18            Defendant.         )           at 10:00 a.m.
                                 )
19                               )
                                 )
20  ─────────────────────────────)

21  *

22  *

23  *

24  *

25  *

26  *

27  *

28  *

1                     **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         Defendant Scott Robinson awaits sentencing for his role in

4    the Beverly Hills mortgage scandal.  Following his indictment,

5    Robinson pled guilty to one count of criminal conspiracy, one

6    count of participating in a bank fraud scheme, and two counts of

7    making false statements to federally insured lenders.

8         Robinson was a licensed real estate appraiser.  He assisted

9    co-defendant Lila Rizk in preparing and signing bogus, inflated

10   appraisals that the Abrams-Fitzgerald organization used to

11   defraud banks.  Robinson's role in the offense changed over time.

12   At the outset of the scheme, he was an active participant in

13   creating the fake appraisals.  However, his role greatly

14   diminished as the plot progressed, and Rizk became far more

15   involved than Robinson in the fraud.  Ultimately, Robinson's

16   complicity was essentially reduced to allowing his name and

17   license number to be used by the fraudsters in return for hefty

18   monthly payments.  The presentence report accurately calculates

19   Robinson's advisory guideline range at 57 to 71 months, which is

20   consistent with the parties' agreement regarding the offense.

21                                   * * *

22        Following his indictment, Robinson promptly pled guilty and

23   began cooperating with the prosecution.  Robinson's cooperation

24   consisted of lengthy interviews in which he explained the roles

25   that Rizk and he played in the fraud, along with information

26   about others in the organization.  When the case against Rizk

27   went to trial, Robinson was prepared to testify on behalf of the

28   prosecution.  He ultimately was not called as a government

witness.  Even so, Robinson's cooperation and willingness to assist the government should be recognized.

For these reasons, the government seeks a reduced sentence for Robinson.  Based on the government's assessment of Robinson's offense, his post-plea cooperation, and the sentence that the Court previously imposed on co-defendant Rizk, the government respectfully requests that Robinson be sentenced to 18 months in custody.

**II.   FACTS AND GUIDELINE CALCULATION**

The government concurs with the factual explanation of the offense set forth in the presentence report.

In summary, defendant Robinson became a licensed real estate appraiser in the late 1990s following a mid-life career change. Rizk became a mentor to Robinson when he entered the appraisal industry.  It was through Rizk that Robinson began working for the Abrams-Fitzgerald organization to provide appraisals used to acquire mortgage loans.  Robinson was involved with the organization from approximately 2000 through the end of the scheme in 2003.  (PSR ¶¶ 16, 17, 21.)

In the initial stages of the fraud scheme, Robinson accompanied Rizk from Orange County (where Robinson and Rizk both lived and primarily worked) to Los Angeles.  They jointly examined Westside properties that Abrams and Fitzgerald bought for the mortgage fraud scheme.

For the loans at issue, the Abrams-Fitzgerald organization needed to get two licensed appraisal reports to support the value of the subject properties.  Rizk told Robinson the inflated values that their appraisal reports were supposed to contain.

Rizk also provided Robinson with information about the "comparable" homes that Robinson was to use in his inflated appraisals of the subject homes.  Robinson knew that the homes to which the subject homes were compared were larger, had nicer features, were in better neighborhoods, and had much higher values than the subject homes.  (Plea Agreement, Factual Basis ¶¶ 10-11.)[1]

Robinson signed appraisal reports for the Abrams-Fitzgerald organization that grossly inflated the values of the subject homes.  Robinson knew that the reports were false because they contained fraudulent certifications that Robinson had: done the work underlying the appraisals; personally selected and viewed the comparable homes used to justify the inflated values; and independently reached his valuations without meeting values demanded by his client.  Robinson also forged the name of a senior appraiser who was required to co-sign Robinson's reports due to Robinson's license status.  (Plea Agreement, Factual Basis ¶¶ 16-17.)

In later stages of the scheme, Robinson performed fewer tasks regarding the bogus appraisals in his name.  Robinson stopped accompanying Rizk to Los Angeles to physically examine the subject homes or photograph comparables.  He ceased writing the actual reports, and eventually merely signed his name to reports written by Rizk.  (Plea Agreement, Factual Basis ¶ 15.)  In his plea agreement, Robinson acknowledged that the

---

[1]     For the Court's convenience, a copy of Robinson's plea agreement with the factual basis is attached at Exhibit 1.

28 appraisals that he signed in his own name caused over $17 million in losses to lenders.

Robinson was well paid throughout the scheme. He originally was paid by the Abrams-Fitzgerald organization on a per appraisal basis. However, by 2001, Robinson received a $6,000 per month retainer payment. Robinson received this payment whether or not he actually appraised a property or wrote an inflated report. (Plea Agreement, Factual Basis ¶ 13.) Robinson received payments from the Abrams-Fitzgerald organization through the close of the scheme in 2003.

The presentence report's calculation of Robinson's offense tracks the parties' plea agreement. The report correctly identifies the base offense level for the fraud-based offenses as 6, and applies a 20-level enhancement for the value of the loss at issue. The 2-level enhancement for abuse of a special skill (licensed appraiser) also applies here. Finally, the government agrees with the 3-level reduction for acceptance of responsibility. The final offense level of 25 with no criminal history translates to an advisory guideline range of 57 to 71 months in custody. The government agrees with this calculation.

## III. ROBINSON'S SUBSTANTIAL ASSISTANCE

The government moves for a 4-level downward departure of Robinson's offense level under USSG § 5K1.1 due to his substantial assistance. Such a motion is merited for a convicted party who has "provided substantial assistance in the investigation or prosecution of another person who has committed

an offense."   The Court may base such a departure on the

following:

> 1.   The court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> 2.   The truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> 3.   The nature and extent of the defendant's assistance;
>
> 4.   Any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> 5.   The timeliness of the defendant's assistance.

USSG § 5K1.1(a).

   Robinson began cooperating with the government following his indictment and arrest in 2007.  In lengthy meetings in November and December 2007, Robinson explained in great detail his role and involvement in the fraud scheme.  Robinson explained how he was roped into the scheme by Rizk.  He provided considerable information about the method by which Rizk prepared the phony appraisal reports at the center of the fraudulent mortgage applications.  Copies of the reports of those interviews are attached at Exhibit 2.

   Robinson's information corroborated statements from co-conspirators Matykowski, Abrams, and others regarding Rizk's corrupt techniques.  Robinson essentially confirmed what the appraisal side of the scheme looked like from the inside. Robinson's explanation as to how Rizk conducted virtually all aspects of the inflated appraisals gave the government real

insight as to how the scheme was implemented.  His guilty plea
also greatly simplified the proof issues against Rizk at trial.

Rizk was offered the opportunity to plead guilty after
Robinson entered his plea and his cooperation was disclosed to
the defense.  When Rizk refused, the government met with Robinson
several times in 2009 in advance of trial.  Those meetings
included preparation for testimony, review of potential trial
exhibits, and mock questioning by prosecutors.  Through the
beginning of trial, the government considered Robinson to be a
potential witness for the prosecution.  The government intended
to elicit testimony from Robinson about Rizk's role,
responsibility, and knowledge in preparing the bogus appraisals
(both in her name and in his) at trial.  When the government's
case-in-chief against Rizk came in well, it was not necessary to
use Robinson's testimony.[2]  Instead, the government chose to wait
to see whether his testimony could be used in rebuttal.  However,
Rizk presented no case.  Ultimately, Robinson did not testify in
the trial.

The government considered Robinson's assistance -- providing
helpful information in pretrial interviews and preparing for
potential trial testimony -- to have been significant, complete,
timely, and of considerable value to the prosecution of the
offenses here.  The government requests that the Court reduce
Robinson's offense level by four levels.

---

[2]  The government evidence at trial against Rizk included
an impressive expert on real estate appraisals, several pled
cooperators, other witnesses, and Rizk's own bogus reports.  This
evidence was sufficient to convict her on all counts.

**IV.    THE GOVERNMENT'S ANALYSIS OF THE RELEVANT SENTENCING FACTORS LISTED IN 18 U.S.C. § 3553(a)**

If the Court concurs with the plea agreement and the government's evaluation of the guideline calculation and grants the government's 5K motion, this will reduce the offense level for Robinson to level 21, with a Guideline range of 37 to 46 months.  The government believes that the Booker / 3553(a) factors merit a below-guideline sentence for Robinson.  The government therefore requests that the Court sentence Robinson to 18 months in custody.

The Court is well aware of the serious nature of the mortgage fraud offenses here.[3]  Phony property valuations from licensed real estate appraisers were crucial to allowing Abrams and Fitzgerald to execute their scheme to defraud mortgage lenders.  When Robinson joined the scheme, he was a willing participant in the plot, and deliberately provided the false appraisal reports as requested by the main fraudsters.

The history and characteristics of the offender are also important here.[4]  Robinson is an Ivy League graduate who achieved success in the hotel industry before turning to the real estate world.  (PSR ¶¶ 95, 102.)  Even as a novice in the appraisal field, Robinson was well aware of the wrongful nature of what Abrams, Fitzgerald, and Rizk convinced him to do with the fraudulent reports.  Directly put, Robinson was smart enough to

---

[3]    18 U.S.C. § 3553(a)(1).

[4]    Id.

7

know better.  He chose, however, to help facilitate the mortgage
fraud scheme rather than work as a legitimate appraiser.

   To his credit, Robinson did not do much beyond that.  After
a period of time, Robinson's involvement decreased and was
limited essentially to lending his license and name to Rizk and
the organization.  He remained on the payroll of the fraud group
for years, though.  A custodial sentence is appropriate to deter
other potential offenders in the real estate and financial
industries and let them know of the consequences of deliberately
assisting a fraud scheme through measures large or small.[5]

   An important criterion in setting the correct sentence for
Robinson is the factor regarding disparities between offenders.[6]
The direct contrast between Robinson and Rizk (whom the Court
sentenced to 36 months in prison) bears close consideration.
Rizk was unquestionably in a senior position to Robinson in
orchestrating and executing the scheme.  And, when the time came
to face the consequences of their criminal conduct, Robinson
chose to plead guilty and help the prosecution while Rizk took
her case to a lengthy trial.

   While the Court noted at previous sentencings that it does
not wish to punish parties who choose to exercise their right to
trial, it is certainly appropriate for the Court to give a
benefit to a defendant who waives that right and thereby
conserves the valuable resources of the judicial system.
Robinson was a lesser offender who pled guilty promptly.  A fair

---

[5]   18 U.S.C. § 3553(a)(2)(A-B).

[6]   18 U.S.C. § 3553(a)(6).

8

result here would be for him to receive a sentence well below
what was imposed on Rizk, but sufficient to meet the statutory
goals of punishment and deterrence.[7]

**V.   <u>CONCLUSION</u>**

The government respectfully requests that the Court accept
the plea agreement and grant the motion for downward departure.
The government further requests that this Court sentence Robinson
to a below-guidelines sentence of 18 months in custody.


Dated: April 14, 2010          Respectfully submitted,

                               ANDRÉ BIROTTE JR.
                               Acting United States Attorney

                               CHRISTINE C. EWELL
                               Assistant U.S. Attorney
                               Chief, Criminal Division

                                    /s/ AUSA Wilner
                               _____
                               JEREMY D. MATZ
                               MICHAEL R. WILNER
                               Assistant United States Attorneys
                               Major Frauds Section

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

---

[7]      The sentences imposed on co-defendants Kyle Grasso,
Jamieson Matykowski, Elliott Fitzgerald, and Tom Schiff involved
offenders with different roles in the organization than Robinson.
For that reason, they are not "similarly situated" and their
sentences not as relevant to the present case.

9